IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DONNA L. SEYMOUR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 04 C 2041 |
| v. | ) | |
| | ) | |
| CAROL HUG and ROGER HUG, | ) | |
| d/b/a REMAX TEAM 2000; | ) | Magistrate Judge Jeffrey Cole |
| PATRICIA BROWN-WYRICK; | ) | |
| CENDANT MOBILITY CORP., | ) | |
| a Corporation; and | ) | |
| CURTIS CASTLE and | ) | |
| CAROL CASTLE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER [1]

### INTRODUCTION

This case has its genesis in Donna L. Seymour's unsuccessful attempt to purchase a home in a suburb of Chicago from realtors, Roger and Carol Hug, Patricia Brown-Wyrick and H&H Realty, Inc. (collectively "Realtor Defendants"), and Cendant Mobility Corp. and Curtis and Carol Castle (collectively "Owner Defendants"). According to Ms. Seymour, although she had successfully negotiated a contract for the purchase of the home, the defendants "sold it out from under her" when they discovered she was African-American. On March 18, 2004, Ms. Seymour filed a complaint alleging unlawful discrimination against her on the basis of race in violation of the Fair Housing Act, 42 U.S.C. §§ 3604, 3605, 3617, and breach of contract under Illinois state law. A week later, she amended her complaint, and she did so again

---

[1] The case is before me pursuant to the parties' consent. 28 U.S.C. § 636(c).

on August 20, 2004. Discovery ensued as did intensive settlement discussions.

On May 24, 2005, the parties filed a Joint Status Report, stating that they "were in the process of finalizing an agreed settlement," and that they had "agreed in principle to a settlement of all claims. A condition of the settlement is that plaintiff must seek approval from the Surrogate's Court in New York, the state of residence of plaintiff and her children, in order to procure a *valid release* of any potential claims of her minor children." (*Id*).[2] On June 20, 2005, counsel for certain of the defendants reported at a status hearing that the case was settled, and that the execution of the formal settlement agreement by all parties was imminent. Accordingly, I dismissed the case with leave to reinstate within 60 days in the event of any unanticipated problem and retained jurisdiction to enforce the settlement agreement.[3]

Apparently, over the course of the next week, the defendants concluded that they had been had – and rather badly at that – by the plaintiff and her lawyers. They demanded that Ms. Seymour make further application to the Surrogate's Court and provide the Court with the information they insisted she had withheld. The plaintiff's lawyers refused. On June 29, 2005, Ms. Seymour filed this present Motion to Enforce the Settlement Agreement or, in the Alternative, to Vacate Dismissal, Reinstate Case, and Enter

---

[2] The approval of the New York court was necessary because a release by a parent does not bind the child. *Santangelo v. City of New York*, 66 A.D. 880, 881, 411 N.Y.S.2d 666 (1978).

[3] Enforcement of a settlement agreement is more than a continuation of a dismissed suit and thus, requires a separate basis for federal jurisdiction. *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375, 378 (1994). The Supreme Court has instructed that a district court retains jurisdiction over enforcement of a settlement agreement if the court either: (1) expressly retains its jurisdiction over the agreement, or (2) incorporates the agreement's terms into its dismissal order. *Id.* at 381. The dismissal order must not provide that the dismissal is with prejudice or the court will not have post-dismissal jurisdiction, even if the order provides for a retention of jurisdiction to enforce a settlement. *Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487, 489 (7th Cir. 2002); *Jessup v. Luther*, 277 F.3d 926, 929 (7th Cir. 2002). As I conditionally dismissed this case without prejudice and expressly retained jurisdiction to enforce the settlement agreement, there is jurisdiction to resolve the present dispute.

Judgment on the Agreement. On July 15, 2005, the defendants filed a Cross Motion to Enforce Settlement and For Fees, in which they contend that Ms. Seymour failed to comply with the terms of the parties' March 14, 2005 settlement agreement. The motion argued that Ms. Seymour and her lawyers had deceived the defendants and the Surrogate's Court in New York into approving the settlement of the instant case and authorizing a release of the claims of Ms. Seymour's children.[4] Ms. Seymour's view of the matter is, predictably, quite different. She denies that there was any settlement on March 14th and insists that the settlement is that contained in a document prepared by the defendants on April 28, 2005, which required that she obtain a release of the childrens' claims. For her, form is substance, and having obtained on May 20, 2005 an order of the Surrogate's Court approving the settlement and releasing any claims of her children, her obligations have been fulfilled.

The difficulty, however, is that form is not substance, and Ms. Seymour's contention that she has complied with the terms of the settlement agreement merely by securing an order of the Surrogate's Court, regardless of the circumstances under which the order was obtained, is plainly mistaken. Under New York law, the Surrogate's Court had to be "fully apprised" of all the relevant facts and circumstances in order

---

[4] Although the word "fraud" does not appear in the defendants' briefing, the accusation of fraud is beyond debate. For example, the plaintiff and her counsel are accused of: having made "substantial and material" "misrepresentations to the [Surrogate's] Court"; having "acted in bad faith" of having filed petitions with the Surrogate's Court containing "blatant misrepresentations"; having concealed [plaintiff's] change in position and thereafter attempt[ing] to unilaterally change the agreed upon terms of the settlement by manipulating the language in drafts of the release"; having "[s]urreptitiously utiliz[ed] a modified form of the" April 28th version of the settlement and release; having without authorization changed the language of the formal agreement approved by the defendants; having made "patently false" representations to the Surrogate's Court in New York; having withheld critical information from that court; having "falsely informed the [Surrogate's Court] that any claims held by the minors were not contemplated, resolved and/or encompassed by the settlement of the underlying action"; and having "deceiv[ed] and mislead [ ]" the Surrogate's Court and having used "deception in an effort to prevent any of the money from going into the children's' trust. . . ." (*Joint Brief in Support of Defendants' Cross-Motion to Enforce Settlement* at 10, 12, 13; *Defendants' Reply Brief* at 4, 6, 9, 11, 12-14).

to make an informed determination of whether the approval of the settlement was in the children's "best interest." Unless that occurred, the defendants would be subject to precisely the risks of future litigation by Ms. Seymour's children that the settlement agreement was designed to avoid. Only the "latitudinarian attitude of Alice in Wonderland towards language," *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582. 654 (1949)(Frankfurter, J., dissenting), could support the plaintiff's contention that the petitions Ms. Seymour filed in New York fully and properly informed the Court of the nature of the children's claims and the allegations made by Ms. Seymour in the underlying action. The disquieting reality is that the Surrogate's Court was ill-served by Ms. Seymour and her legal advisors, and that by failing to comply with New York law in her presentation to the Surrogate's Court, Ms. Seymour breached the settlement agreement she made with the defendants.

## I.
## FACTUAL BACKGROUND

### A.
### The Complaints, Discovery, And Early Settlement Demands

All of Ms. Seymour's pleadings repeatedly referred to her "family" and "children." The complaint and amended complaint charged that she "celebrated with her children having successfully negotiated for their new home." (*Compl.*, at ¶ 60; *Am. Compl.*, at ¶ 57). She also alleged that she brought her children to see the home. (*Am. Compl.*, at ¶ 49). All three versions of her complaint alleged that the defendants' actions caused Ms. Seymour "*and her family* economic injury, consequential damages and personal harm," (*Compl.*, at ¶¶ 77, 80, 82, 84; *Am. Compl.*, at ¶¶ 102, 105, 107, 109; *2nd Am. Compl.*, at ¶¶ 111, 114, 116, 118)(emphasis supplied), and requested compensatory and punitive damages "for discrimination against her *and her children*." (*Compl.*, at ¶ 84 Prayer d; *Am. Compl.*, at ¶¶ 102 Prayer (d), 105 Prayer

(d), 107 Prayer (d); *2nd Am. Compl.*, at ¶¶ 111 Prayer (d), 114 Prayer (d), 116 Prayer (d))(emphasis supplied).

Consistent with these allegations of harm to her children, in the complaints, Ms. Seymour demanded in August 2004 that in addition to payment of $150,000 in damages to her, her two children were entitled to $50,000 "to compensate them for defendants' illegal actions, and the resulting emotional distress." (*Defendants' Brief*, Ex. B). Ms. Seymour's insistence that her children were harmed by the defendants' actions – and thus had their own claims – continued into discovery. When asked at her deposition in December 2004 to explain what damages were being claimed, Ms. Seymour said that it had been "a very painful experience for myself, for my children," and that she relocated "my family because of this occurrence." (*Defendants' Br.* Ex. C at 34). When counsel for the owner defendants, asked if Ms. Seymour understood that her children were not party to this lawsuit, Ms. Seymour responded that while her children were not parties, "my children have been affected by the discrimination that this lawsuit is about. . . ." *Id.* at 35. When asked if she was making a claim on behalf of her children, Ms. Seymour declared: "My children's lives have been *forever altered* as a result of this lawsuit, which was us having to relocate across the country. I have not chosen *at this time* to file a lawsuit on their behalf." *Id.* (Emphasis supplied). There then followed this telling exchange between Ms. Donaldson and Ms. Seymour:

Q: Are you making a claim in this lawsuit for damages that you claim were suffered by your children as a result of this transaction?

A: I'm making a claim in this lawsuit that *my children's lives have been affected by what has occurred in this transaction.*

Q: And you're making that claim despite the fact that your children are not plaintiffs and this action is not brought on their behalf.

5

A: That's correct.

*Id.* at 36. (Emphasis supplied).

It is thus clear that Ms. Seymour was of the view that her children had their own independent, substantial claims, and, although they were not being asserted "in a lawsuit" "at this time," the specter of future litigation by the children loomed like a brooding omnipresence. From any prudent perspective, a settlement with Ms. Seymour had to include the children's unpled claims. That, at least, was the defendants' non-negotiable position.

## B.
## The Early Settlement Negotiations

The unpled claims of Ms. Seymour's children remained a central issue as the settlement negotiations continued into early 2005. On March 11, 2005, Mark Howard, counsel for the realtor defendants, emailed the terms of defendants' settlement offer to William Caruso, one of Ms. Seymour's counsel. (*Defendants' Br.* Ex. D1). The first two of five terms predictably dealt with the children's claims:

> 1) Plaintiff to amend complaint to include minors' claims prior to dismissal pursuant to settlement, and to petition [Magistrate Judge] Levin in accordance [with] NY state law Chapter 308, section 1207 (reproduced below) *and allocate a reasonable amount to the minor's [sic] claims*, and in the event Levin declines to exercise jurisdiction, then plaintiff will institute a special proceeding in NY;
>
> 2) $37,500 total offer divided among the plaintiff and her children in the manner approved by the appropriate court, inclusive of any and all attorneys fees and costs . . .

*Id.* (Parenthesis in original). Mr. Howard sent along a copy of § 1207 of the New York Civil Practice Law and Rules, adding emphasis to the portions he believed pertinent:

> **1207. Settlement of action or claim by infant, judicially declared incompetent or conservatee, by whom motion made; special proceeding; notice; order of settlement.** **Upon motion of a guardian of the property** or guardian ad litem of an

infant **or, if there is no such guardian, then of a parent having legal custody of an infant**, or if there is no such parent, by another person having legal custody, or if the infant is married, by an adult spouse residing with the infant, or of the committee of the property of a person judicially declared to be incompetent, or of the conservator of the property of a conservatee, **the court may order settlement of any action commenced by or on behalf of the infant,** incompetent or conservatee. **If no action has been commenced, a special proceeding may be commenced upon petition of such a representative for settlement of any claim by the infant, incompetent or conservatee in any court where an action for the amount of the proposed settlement could have been commenced.**

*Id.* (Boldface added by Mr. Howard, underlining in §1207). Acknowledging the offer on March 13, 2005, Mr. Caruso indicated that he still had not received approval from Ms. Seymour, but that he would be speaking with her that day. Mr. Caruso told Mr. Howard that he thought "it [the final settlement figure] will go at $40,000." (*Defendants' Br.* Ex. D2).

On March 14, 2005, Mr. Howard spoke with Leslie Matlaw, Ms. Seymour's co-counsel, regarding settlement negotiations and the defendants' March 11 offer. As a follow-up to their conversation, Mr. Howard faxed to Ms. Matlaw a two-page letter that set forth the defendants' "offer" to settle. (*Defendants' Br.* Ex. D3). The letter stressed that "all our offers have included court approval of the minor's [sic] claims," and explained that, after his review of New York law, he believed it was necessary to have the matter approved by the court, and cited, *in haec verba,* the relevant New York statute and provided case authority to support his interpretation. *Id.* Following his lengthy and reasoned explanation of why approval of settlement of the minors' claims was legally required and the *sine qua non* of any settlement agreement, Mr. Howard enumerated the five conditions for settlement:

> (1) Plaintiff to amend complaint to include minors' claims prior to dismissal pursuant to settlement, and to petition [Magistrate Judge] Levin in accordance [with] NY state law Chapter 308, section 1207, and *allocate a reasonable amount to the minor's [sic] claims*, and in the event [Magistrate Judge] Levin declines to exercise jurisdiction, then

plaintiff with institute a special proceeding in NY;

(2) $40,000 *total offer divided among the plaintiff and her children in the manner approved by the appropriate court*, inclusive of any and all attorneys fees and costs; In the event that Judge Levin declines jurisdiction over the approval process, we will pay an additional $1,000.00 to defray costs of the approval process in New York.

(3) Plaintiff's acknowledgment in the release that the defendants claim that the settlement is of a disputed claim, and made solely to avoid litigation and that liability is denied.

(4) Confidentiality as to all terms and conditions of settlement, by all parties and counsel;

(5) A release of all claims for legal or equitable relief to be drafted by defendants for execution by plaintiffs, incorporating the above terms.

*Id.* (Emphasis supplied).

That same day, Ms. Matlaw responded to this letter. (*Defendants' Br.* Ex. D4). First, she summarized her conversation with Mr. Howard that morning, conveying "Ms. Seymour's counter-offer to settle . . . for a Confidential $45,000 total offer (or $40,000 with a Gag Order) and *her acceptance of all other terms set forth in your fax* other than the filing of a [separate] New York action in relation to her children's claims." *Id.* (Emphasis supplied).[5] Ms. Matlaw further reported that she was "very pleased to report that Ms. Seymour has **accepted** a total offer of $40,000 for all Defendants and will accept the Confidentiality Provision in Full and Final Settlement of all claims with no Defendant acknowledgment of liability." (Boldface by Ms. Matlaw). According to Ms. Matlaw, Ms. Seymour was prepared to execute the defendants' release "subject to our review and approval." *Id.*

Ms. Matlaw went on to explain why a new action in New York would not be needed:

---

[5] Attached to Ms. Matlaw's March 14th letter was Mr. Howard's earlier letter that day. (*See* Ex. D4).

8

Ms. Seymour is both Devin and Peter Madkin's parent and their Guardian pursuant to an *already-existing Minors' Estate in New York Surrogates' [sic] Court*. Thus, rather than filing a *separate* lawsuit which would show up in a litigation search contrary to Ms. Seymour's wishes, we should be able to get the necessary judicial approval by simply petitioning the New York judge for approval of our Agreed Consent Order.

*Id.* (Emphasis supplied). Upon considering the relevant procedure and costs, Ms. Matlaw informed Mr. Howard that Defendants' offer of $1,000 toward "the costs of judicial approval of the minors' claims" was more than adequate. *Id.* In closing, Ms. Matlaw expressed her belief that "we can resolve all outstanding issues and develop agreed-upon language in the very near future" and that she was "prepared to report to Judge Levin [the following] Wednesday morning that we have settled this case in principle, that Plaintiffs are preparing an Amended Complaint and Draft Agreed Consent Order for production to Defendants, and that we anticipate presenting these for Judge Levin's approval by the end of the month." *Id.*

Additional discussions ensued and, later that day, Mr. Howard sent an email to Ms. Matlaw and Mr. Caruso expressing his agreement that "we do not need to amend the complaint if you are going to get the New York court to approve the settlement." (*Defendants' Br.* Ex. D5). Mr. Howard included a draft affidavit on which he had been working for Ms. Seymour's approval of settlement that he felt comported with the requirements of New York law, CPLR § 1208. Paragraphs 4 and 5 of the draft affidavit made clear that the children had their own claims that the Surrogate's Court was to consider:

4. Plaintiff has claimed that the children's expectations were disappointed when they were unable to obtain a home, and general emotional damages have been claimed. There are no related medical or psychological treatments or bills that have been incurred on behalf of either minor child.

5. For all claims, defendants have proposed a settlement in the total amount of $40,000, $30,000 payable to Donna Seymour to resolve her claims and $5,000 each payable to the estates of Peter Madkin and Devin Madkin. The minors settlement amounts will be reduced by application of a 1/3 attorney fee, resulting in a net payment to each of

9

3,333.33, which I will hold for them . . . until the respective minor child reaches the age of majority.

*Id.* Replying to Mr. Howard via email later that evening, Ms. Matlaw said she agreed that they need not amend the complaint, but simply proceed directly to petition the Surrogate's Court, which was overseeing the "already-existing Minors' Estate" for approval of the settlement and release of their claims. (*Defendants' Br.* Ex. D6). She also reported that she spoke in detail with a clerk in the New York Surrogate's Court and learned that the court could rule in approximately two weeks based upon a statement as to the "nature of the action [and] why it is fair and in the wards' best interests." (*Defendants' Br.* Ex. D6). Ms. Matlaw also indicated some confusion over whether she could represent the children in New York or whether Seymour will proceed *pro se.* *Id.* She concluded with an assurance that "[w]e'll straighten it all out and make sure that a *proper* New York Petition is on file by the end of the week so that the Order approving the Settlement of the minors' claims can be part of the Petition before Judge Levin." (Emphasis supplied).

Thus, by the end of the day on March 14, 2005, it is clear that the parties had agreed to the following:

1.   Ms. Seymour was to be paid $40,000 in full and final settlement of all claims; She was to allocate a reasonable amount of this sum to her children's claims in the manner approved by the appropriate court;
2.   The settlement was to be confidential;
3.   There would be a denial of liability by the defendants;
4.   The plaintiff would seek approval from the Surrogate's Court in New York of the settlement agreement and the release of the children's claims;
5.   The defendants would pay $1,000 to defray the costs of the approval process in New York if New York counsel were used.

That Ms. Matlaw had agreed on behalf of her client that some portion of the $40,000 was to be

allocated to the children is reenforced by the events of March 22, 2005. That day, Mr. Howard followed up with both Ms. Matlaw and Mr. Caruso to request projections on the timing of the Surrogate's Court's approval. (*Defendants' Br.* Ex. D8). On March 24, 2005, Ms. Matlaw replied that she needed an approved settlement agreement as an exhibit to support the petition that would be filed in New York. *Id.* Just a few minutes later, Mr. Howard replied via email and asked Ms. Matlaw to provide "the allocations that you will propose to the court for the children" and indicated that he would amend the draft after approval from defendants' other counsel. *Id.* The next day, March 25, 2005, Ms. Matlaw replied that "[w]e envisioned a pro-rata breakdown similar to that found in the damages statement we provided following our in-chambers discussion with Judge Levin. We've conveyed proposed amounts to [Seymour], but have yet to hear back from her." *Id.* She then asked for the current draft of the agreement so she could review the other terms and "fill in the blanks" once Ms. Seymour had decided on the breakdown. *Id.* [6]

Thus, by March 25th, the only open issue was the amount Ms. Seymour would allocate to the children. That there was to be an allocation in some amount was agreed upon. On March 29, 2005, Mr. Howard sent the proposed draft release and settlement agreement (the "March 29 Version") and asked both Mr. Caruso and Ms. Matlaw to review and indicate whether it was acceptable. (*Defendants' Br.* Ex. D9). Consistent with all the parties' prior exchanges, the formal written agreement envisioned some payment to the minors and court approval of the settlement. Thus, paragraph b. provided:

> Donna Seymour agrees to obtain approval of the proposed settlement of the claims of the minor children named Peter Madkin and Devin Madkin from a court in New York state where the children reside, and provide a copy of the order authorizing the settlement and

---

[6] Presumably, the pro-rata breakdown would be $5,000 to each of the children. This amount is 25% of $40,000 which bears the same ratio that the $50,000 settlement demand bore to the $200,000 total originally demanded by Ms. Seymour on August 31, 2004.

directing the amounts to be paid to the minors' estates [7]

The next day, March 30th, Ms. Seymour had a change of heart and sent this email to Ms. Matlaw:

I received your fax. There is no aplit[sic] concerning Peter and Devin. I am the one whohas[sic] gone in to [sic] debt and should be reimbursed. I will not ettle [sic] if any of this money is going in to [sic] their trusts and not to me.

(*Brief in Support of Plaintiff's Motion To Enforce Settlement* ("*Pl. Br.*") Ex. D). Ms. Seymour's lawyers never told defense counsel of this email or Ms. Seymour's position. Instead, they embarked on what the evidence compellingly suggests is a pattern of deception designed to gull not only the defendants' lawyers, but the Surrogate's Court in New York as well.

In her brief, plaintiff calls the March 30th fax an "unequivocal rejection" of designating any part of the settlement to her children's trusts. (*Pl. Br.*, at 2). Perhaps it was. The difficulty is that Ms. Seymour's lawyers chose to conceal it from the defendants until the briefing on the present motions, and Ms. Seymour's undisclosed rejection – whether unequivocal or not – is thus analytically meaningless. *See infra* at 25.

## C.
### The Plaintiff's Lawyers Changes to the Language Regarding the Children's Claims Following the Receipt of Ms. Seymour's Email of March 30th

If it be true that honesty of purpose prompts frankness of statement, *Crosby v. Buchanan*, 90 U.S. 420, 454 (1875), the post-March 30th conduct of Ms. Seymour's lawyers does not fare well. Rather than

---

[7] Paragraph i. provided that the realtor defendants would contribute up to an additional $1,000 toward attorney's fees and expenses payable to New York counsel for time and expenses directly incurred in connection with obtaining New York Court approval for the minor's settlements. Paragraph k. provided for indemnification under certain circumstances and paragraph h. contained a confidentiality provision.

tell defense counsel of Ms. Seymour's *volte face*, Mr. Caruso acted as if nothing had occurred and that everything was on track in accordance with the March 14th exchange of emails. On March 31, 2005, he was "revising the settlement agreement and preparing materials to obtain release of claims by minors." (*Defendants' Br.* Ex. D9). On April 1, 2005, Mr. Howard was sent a revised draft of the settlement agreement for his review. The covering email stated:

> We believe the key factors are 1) the releases should be joint and mutual, and 2) Paragraph K in your draft [the Indemnity Paragraph] was stricken because the New York court order will obviate the need for that paragraph. *We made other minor changes, which did not amount to any substantive changes.*

(*Defendants' Br.* Ex. D10)(Emphasis supplied).

Among the purportedly "minor" "[non-] "substantive changes" was a change to what had been Paragraph b. (but now was redesignated as Paragraph c.). In Mr. Howard's March 29th draft, Paragraph c. provided:

> Donna Seymour has obtained approval of the proposed settlement of the claims of the minor children named Peter Madkin and Devin Madkin from a court in New York state where the children reside, and provided a copy of the order authorizing the settlement and directing the amounts to be paid to the minors' estates.

(*Defendants' Ex.* 1).[8] In the April 1st version, as changed by Ms. Seymour's lawyers following her March 30th email, the critical phrase, "of the claims of the minor children named Peter Madkin and Devin Madkin from a court in New York state where the children reside, and provided a copy of the order authorizing

---

[8] It is undisputed that Paragraph c. as drafted by Mr. Howard, contained this language. (*Plaintiff's Response to Defendants' Joint Brief in Support of Their Cross-Motion to Settlement*[sic], at 1-2).

the settlement and directing the amounts to be paid to the minors' estates" was deleted.[9] Mr. Howard, "supposing he was dealing with . . . honorable [people] . . . of high-standing at the bar, whose professional robe indicated the higher virtues," considered he was secure in relying on the assurance that the deletion in Paragraph c. was minor and not at all substantive. *Dickerman v. Burgess*, 20 Ill. 266 (Ill. 1858).

## D.
## The Aftermath

The remaining correspondence between the parties focused on the settlement agreement's confidentiality provision, with no further mention of the children's claims. On April 28, 2005, Mr. Howard sent a revised draft of the proposed settlement agreement and documents stipulating to the dismissal of the case. (*Defendants' Br.* Ex. D22). Paragraph c. incorporated the purportedly minor non-substantive change and Paragraph j. provided that the defendants would pay $1,000 to New York counsel for time and expenses incurred in obtaining New York approval for the terms of the settlement. In the email accompanying this version, Mr. Howard asked: "Please review, and answer the eternal question – "Are

---

[9] Although the plaintiff maintains that the defendants "themselves excised this language from the final draft presented for plaintiff's approval," (*Amended Brief in Support of Plaintiff's motion to Enforce Settlement*, at 2), the defendants deny it, and the evidence and common sense support the defendants' version of events. From the beginning, it was the defendants' view that the release of the children's claims had to be supported by consideration and thus there had to be some allocation of the settlement amount to them. There is simply no basis to conclude that they would have suddenly had a change of heart and unilaterally excised language that was critical to their view of New York law and that no one had objected to. Moreover, pursuant to my order of September 30, 2005, I have been provided with a copy of the plaintiff's April 1st revisions to Mr. Howard's March 29th draft. It is plain that the plaintiff, not the defendants, excised the language quoted above, and then tendentiously characterized it as one of the "minor," non-substantive changes they made. Beyond this, a review of the exhibits and the word-track functions on the documents attached to the parties' briefs makes clear that it was the plaintiff's lawyers who were responsible for the deletion of the language. *See generally* Defendants' Joint Reply in Opposition to Plaintiff's Motion to Enforce Settlement, at 5; Defendants' Brief Ex. D10 and Ex. 3 to Defendants' Joint Reply in Opposition to Plaintiff's Motion and D22 to Defendants' Opening Brief.

14

we there yet?" (*Defendants' Br.* Ex. D22). According to the plaintiff, the manner in which defendants presented the April 28 version left no reason to believe that it was anything other than the final language for which the defendants sought the plaintiff's assent. (*Amended Brief in Support of Plaintiff's Motion to Enforce Settlement*, at 3; *Plaintiff's Response to Defendants' Joint Brief*, at 2-3).

The course Ms. Seymour's lawyers pursued after receiving this email mirrored the course they pursued after receiving Ms. Seymour's March 30th email. Just as they did not tell Mr. Howard and his colleagues that on March 30th Ms. Seymour had refused to go along with any allocation, they did not tell Mr. Howard that they were going to take the draft agreement to New York, that they would make it appear that the children had absolutely no claims, or that they would make another change to the language of Paragraph c. Indeed, there was no further communication between the parties until May 23, 2005. And even then the information provided to the defendants was misleading.

## E.
## The Proceedings in the Surrogate's Court in New York

On May 20, 2005, unbeknownst to defendants, Ms. Seymour petitioned the Saratoga County Surrogate's Court in New York State to approve the settlement agreement, which only she had signed and which her lawyers had surreptitiously altered. (*Defendants' Br.* Exs. F1, F2). Ms. Seymour filed two identical petitions in the Surrogate's Court, one on behalf of Devin and one on behalf of Peter. The petitions presented a misleading picture of the claims of her children and their importance to the agreed upon settlement of her Fair Housing Act claim in the Northern District of Illinois.

Under New York law, it was absolutely critical that the "best interests" of the children be protected, and to do that the Surrogate's Court had to be "fully apprised" of all of the critical facts. *See*

15

New York Civil Practice Law and Rules. §§1207-1208 *Cf. Jay Burns Baking Co. v. Bryan*, 264 U.S. 504, 520 (1924)(Brandeis, J., dissenting)("Knowledge is essential to understanding, and understanding should precede judging."). The importance of absolute candor with the New York court was essential in light of the non-adversarial nature of the proceedings.[10]

The presentation to the Surrogate's Court by Ms. Seymour through her petitions was *not* designed to "fully apprise" the Court as New York law required. For example, the petitions did not reveal that Ms. Seymour's claim involved the attempted purchase of a home, only that "property" was involved, that she was in the active business of investing and dealing in real estate, and that the damages sought included "the loss of commissions, business, and business opportunity because of discrimination against her. . . ." (*Defendants* Ex. F1). The Court was thus led to believe that Ms. Seymour's business interests only were implicated. Concealed was the fact that, according to Ms. Seymour, she was forced to relocate her entire family as a consequence of the defendants' discrimination against her and her children.

But this was fairly subtle, and so the petitions stressed that only Ms. Seymour was affected by the defendants' misconduct and only she had a claim, which she had decided to settle for $40,00, to avoid the cost, delay, uncertainty, and burden of further litigation in Illinois. (*Defendants' Br.* Exs. F1-F2, at ¶ 4). The petition relating to Devin alleged:

In the federal complaint, there is no mention of Devin Madkin, who is the

---

[10] Just as "skill of counsel, where found on one side only, terrifyingly weights the scales of judgment," Llewellyn, The Common Law Tradition: Deciding Appeals 31 (1960), so too do deceptive presentations in a non-adversarial setting. In that context, the need for absolute candor is perhaps greater since there is no one to challenge the presentation. Thus, rules of ethics as they pertain to lawyers require disclosure to the tribunal in an *ex parte* proceeding of "all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse." Rule 3.3(d), Illinois Supreme Court Rules of Professional Conduct.

child of Petitioner. She was not named in the complaint, no claim was made on her behalf, and *defendants* have not claimed that there is evidence of any damages for or liability to Devin Madkin.

(Emphasis supplied). The petition relating to Peter is identical except for his name and gender reference.

Of course the "defendants" had not claimed there were any damages to the children. They had denied liability. Ms. Seymour, however, had insisted that her children had been profoundly affected by all that occurred. It was manifestly false to say that the defendants "did no discovery regarding the existence of any possible interest of any minor child" and that "there were no allegations or claims to that effect." (*Defendants' Br.* Ex. F1, at ¶ 8; *Defendants' Br.* Ex. F2, at ¶ 8). The petitions were careful to make no mention of the pleadings' insistence that the defendants had "caused her *and her family*, economic injury, consequential damages, and economic harm" or that she had sought compensatory and punitive damages "for discrimination against her *and her children* ...." (*2nd Amended Complaint*, ¶ 111; Prayer for Relief (d); ¶ 114; Prayer for Relief (d); ¶ 116; Prayer for Relief (d); ¶ 118 (Emphasis supplied)). Nor did they reveal that Ms. Seymour had originally asked for $25,000 each for her children in one of her settlement demanded, that she repeatedly referred to the alleged discrimination's effect on the children during her deposition, or that she had claimed at her deposition that her "children's lives have been forever altered as a result of this lawsuit, which was us having to relocate across the country. I have not chosen *at this time* to file a lawsuit on their behalf." In short, the petitions could scarcely have been more misleading as they related to the existence of claims by Ms. Seymour's children and the importance the release of those unpled claims played in the settlement discussions.

Ms. Seymour asked the New York Court to approve the settlement agreement and "specifically find that Devin Madkin has no interest in such settlement and such order shall be a waiver, release, and

17

satisfaction of all claims Devin Madkin had, has, or may have against any" of the Defendants. (*Defendants' Br.* Ex. F1, at ¶ 11). She made an identical request with respect to Peter Madkin. (*Defendants' Br.* Ex. F2, at ¶ 11). As a result, the Surrogate's Court, thinking itself "fully advised in the premises," ordered the settlement "approved as being in the Ward's best interest" and ordered that the executed settlement be filed with the court within 30 days of execution and entry of the Agreed Consent Decree. (*Defendants' Br.* Exs. E1, E2).

The settlement agreement presented by Ms. Seymour to the New York Court and attached to its order was, essentially, the April 28 version, with one change, made by the plaintiff's lawyers without the knowledge or approval of defense counsel: the phrase in Paragraph c., "Miss Donna Seymour has obtained approval of the proposed settlement of *the* claims of the minor children," was changed to "Donna Seymour has obtained approval of the proposed settlement of *any* claims of the minor children." (Emphasis supplied). The document was signed by Ms. Seymour and notarized on May 20, 2005.

"Of course, the [change]. . .would not have been [made] unless it had been intended to have some effect, and we do not see what effect it could be expected to have" upon Judge Seibert of the Surrogate's Court "except to influence him" that the children had no claims. *Schenck v. United States*, 249 U.S. 47, 48 (1919)(Holmes, J.). *Cf. United States v. Ladish Malting Co.*, 135 F.3d 484, 490 (7th Cir. 1998)("The prosecutor must have thought that the instruction mattered; why else so vigorously oppose Ladish's request for an actual-knowledge instruction"). The intended effect seems obvious: the phrase "the claims of the minor children" connotes the existence of actual concrete claims, while the phrase, "any claims of the minor children," suggests the kind of hypothetical, non-existent claims that are often the subject of releases because of lawyers' excessive (but quite proper) caution.

In deciding whether a release of claims where the minors receive nothing is in the minor's "best interests," a court would certainly have wanted to know whether actual or theoretical claims were involved. The petitions presented to Judge Seibert left no doubt that only Ms. Seymour had been harmed, and that the children had no real basis for complaint. On May 20th, the Surrogate's Court entered its approval orders. (*Defendants' Br.*, Ex. E1, E2). Neither the application to nor the approval of the New York court was communicated to defense counsel.

## F.
## The Parties' Report to This Court and the Subsequent Dispute

On May 23, 2005, the parties re-initiated communications via email regarding the preparation of a joint status report. Mr. Caruso indicated that he could get the report prepared, and he said that he believed the parties had reached an agreement "subject only to the defendants' requirement of protection from any action by a child when they reach maturity." (*Defendants' Br.*, Ex. D24). The email made no mention of Judge Seibert's May 20th order. On May 24th, the parties filed a Joint Status Report summarizing, *inter alia*, the status of settlement negotiations:

> The parties have agreed in principle to a settlement of all claims. A condition of the settlement is that plaintiff must seek approval from the state courts of New York, the state of residence of plaintiff and her children, of the settlement in order to procure a *valid* release of any potential claims of her minor children.

(*Defendants' Br.* Ex. G)(Emphasis supplied). Apparently, the defendants still had not been informed of the New York court's approval of the settlement. (*Amended Brief in Support of Plaintiff's Motion to Enforce Settlement*, at 4; *Defendants' Joint Reply in Opposition to Plaintiff's Motion*, at 7).

On June 20th, Mr. Howard, in an email to counsel for both parties, noted that the release approved in New York was not the version with the confidentiality language last approved. (*Defendants' Br.* Ex.

D27). Ms. Donaldson, in particular was dismayed by the confidentiality language, and indicated via email on June 21, 2005, that "no one at [her firm], counsel for the 'owner' defendants, had finally approved or consented to the language in the draft release attached to the orders. This oversight needs to be corrected." (*Defendants' Br.* Ex. D29). Mr. Caruso responded, informing Ms. Donaldson that he was under the impression that she had approved the language before he sent the agreement to New York for approval. (*Defendants' Br.* Ex. D30). Later that day, after speaking with her clients, Ms. Donaldson indicated acceptance of the Release already approved by the New York Court, but requested a copy of the petitions that were filed in New York. *Id.*

Despite a further exchange of emails, Ms. Donaldson, as of June 27th, still had not received the copies she had requested. Also, at that point, having finally learned of the presentation by Ms. Seymour to the Surrogate's Court, Ms. Donaldson sent an email to plaintiff's counsel complaining of what she deemed to be a breach of the settlement agreement:

> As addressed in the Release, the purpose of involving the New York court was to obtain 'approval of the proposed settlement of any claims of the minor children.' And, as noted in the Joint Status Report, 'to procure a *valid* release of any potential claims of [the] minor children.' *The Petitions allegedly presented to the court do not comport with this purpose.* The Petitions ask for a finding that the children have NO interest in the settlement and assert that the petitioner has settled HER claim for $40,000. If this is so, then the Petitions would need to unequivocally concede that the children are without claims and were not injured by the alleged 'wrong' in order to be in compliance with the terms and conditions of the settlement. The Petitions are silent on this point, and instead, speak to an assertion that any claims of the minors were not part of the underlying litigation and therefore the minors have no interest in the settlement fund. *As such, the plaintiff is in breach of the agreement as she has not 'obtained approval of the proposed settlement of any claims of the minor children . . . .*

(*Defendants' Br.* Ex. D32)(Emphasis supplied). Ms. Donaldson described what she viewed as "several false and wholly unsupported statements set forth in the draft Petitions" and insisted that the certain

representations made by Ms. Seymour were "patently false." *Id.*

On June 28, 2005, Mr. Howard amplified these concerns. He argued that the Surrogate's Court's order was obtained on incomplete information, which prompted the defendants' concern that the release, entered into on behalf of the minor children, could be subject to attack for, under New York law, orders of the Surrogate's Court obtained by fraud or mistake. *Id.* He explained that he "would still like to see the settlement go through," and suggested that Ms. Seymour try again in New York, offering an additional $1,000 "to be payable to a New York attorney for prospective work on straightening this out." (*Defendants' Br.* Ex. D35). Not surprisingly, given what had occurred, Mr. Caruso responded that he "disagree[d] with [Mr. Howard's] interpretation of the settlement" and notified Mr. Howard of this pending motion to enforce the settlement. (*Defendants' Br.*, Ex. D36).

## G.
## The Parties' Contentions in this Court

The parties are united in insisting that there is a binding settlement agreement. (*Motion to Enforce Settlement Agreement*, at 1; *Joint Brief in Support of Defendants' Motion to Enforce Settlement*, at 1). Their dispute focuses on the terms of that agreement and when it was reached. According to the plaintiff, the settlement agreement is the April 28th version, and all that it required was that she obtain approval of the proposed settlement of any claims of her minor children and provide a copy of the order authorizing the settlement from the Surrogate's Court. Having done that, says she, that is the end of the matter, and the defendants owe her $40,000.

The defendants have a very different view. They submit that the material and essential terms of the parties' agreement are contained in the written email exchanges, which constitute a binding settlement

21

agreement, which came into being on March 14th. They contend that Ms. Seymour was required to allocate some portion of the $40,000 to her children and without such an allocation, the release is without consideration and thus not binding. In addition, Ms. Seymour had to comply with New York law and to fully apprise the court of the children's claims in order for any release to be valid. They argue, persuasively, that Ms. Seymour's presentation did not comply with New York law in that it was underinclusive and deceptive. For the defendants, the April 28th version was not the settlement agreement, but merely a "draft Release." (*Defendants' Joint Reply in Opposition to Plaintiffs' Motion*, at 8). The plaintiff summarily dismisses these concerns, arguing that she was completely candid with the New York court, and that the releases are valid. In any event, she argues that the defendants are protected from future litigation by the children because the statute of limitations on Fair Housing Act claims has run.

## II.
## ANALYSIS

### A.
### The Parties Reached an Enforceable Settlement Agreement on March 14, 2005

Settlement agreements are contracts, and their construction and enforcement are governed by principles of local law applicable to contracts generally. *Laserage Tech. Corp. v. Laserage Lab. Inc.*, 972 F.2d 799, 802 (7th Cir. 1992); *McCall-Bey v. Franzen*, 777 F.2d 1178, 1186 (7th Cir. 1985). Under Illinois contract law "'the primary object in construing a contract is to give effect to the intention of the parties involved.'" *In re Doyle*, 144 Ill.2d 451, 468, 581 N.E.2d 669 (1991). An agreement is binding if the parties agree on all material terms. *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 313-314, 515 N.E.2d 61 (1987). Whether the parties came to agreement is determined not by their

22

subjective intent, but by what they expressed to each other in their writings. *Abbott*, 164 F.3d at 387. Thus, the parties decide for themselves whether the results of preliminary negotiations bind them, but they do so through their words. *Id.* at 388; *see also Empro Mfg. Co. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989)(*citing Chicago Inv. Corp. v. Dolins*, 107 Ill. 2d 120, 481 N.E.2d 712 (1985)).[11]

Unless parties expressly condition their agreement on the signing of a formal document, informal writings manifesting each party's intent to be bound by the material terms proposed constitute a binding settlement agreement. *Abbott*, 164 F. 3d at 388-89; *see also Empro*, 870 F.2d at 425. A contract is sufficiently definite and enforceable as long as the court can, under proper rules of construction and applicable principles of equity, ascertain what the parties have agreed to. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 29, 578 N.E.2d 981 (1991); *see also Dawson*, 977 F. 2d at 373. There is no requirement that an agreement be "signed, sealed, and delivered" to be binding, *Abbott*, 164 F. 3d at 389, and Illinois courts have not been shy about enforcing promises made in the context of ongoing negotiations and often involving preliminary or incomplete agreements. *Dawson v. General Motors Corp.*, 977 F. 2d 369, 374 (7th Cir. 1992). Phrased differently, a contract is enforceable even though some terms may be missing or left to be agreed upon by the parties. *Academy Chicago Publishers*, 144 Ill. 2d at 30; *see also Johnson v. Jung*, Nos. 02 C 5221, 04 C 6158, 2005 WL 1126897, at *3 (N.D. Ill. May 4, 2005); *Rose v. Mavrakis*, 343 Ill. App. 3d 1086, 1090-91, 799 N.E.2d 469 (1st Dist. 2003).

Application of these fundamental principles leads to the conclusion that by virtue of the exchange of emails, a binding contract arose on March 14, 2005. (*Defendants' Joint Reply in Opposition to*

---

[11] New York law is in accord. *Flores v. The Lower East Side Service Center, Inc.*, 4 N.Y.2d 363, 828 N.E.2d 593 (2005).

*Plaintiff's Motion*, at 10-11). By the end of the day, the parties had agreed to all the material terms and conditions of the contract, including:

1.  Ms. Seymour was to be paid $40,000 in full and final settlement of all claims;
2.  She was to allocate a reasonable amount of this sum to her children's claims in the manner approved by the appropriate court;
3.  The settlement was to be confidential;
4.  There would be a denial of liability by the defendants;
5.  The plaintiff would seek approval from the Surrogate's Court in New York of the settlement agreement and the release of the children's claims;
6.  The defendants would pay $1,000 to defray the costs of the approval process in New York if New York counsel were used.

It is no answer to say that Ms. Seymour's March 30th email to her lawyers was an "unequivocal rejection" of the allocation provision – a provision she had accepted two weeks earlier through her lawyers. Under basic principles of agency, that approval bound her. *Knisley v. City of Jacksonville*, 147 Ill. App. 3d 116, 120, 497 N.E.2d 883 (4th Dist. 1986); *In re Marriage of Clarke*, 194 Ill.App.3d 248, 252, 550 N.E.2d 1220 (1st Dist. 1990) (attorney's statements may bind the client to a settlement agreement even when the client later claims to have misunderstood the terms of the settlement). In addition to coming too late, Ms. Seymour's "rejection" was never communicated to the defendants, and a secret, undisclosed "mental reservation" on the part of one party to a settlement agreement is ineffectual. *See Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330-331 (1977), citing 1 Williston, Contracts, § 22, at 46-48 (3d. ed. 1957); *American College of Surgeons v. Lumbermens Mut. Casualty Co.*, 142 Ill. App. 3d 680, 693-694 (1st Dist. 1986). "[P]rivate intent counts only if it is conveyed to the other party and shared." *Robbins v. Lynch*, 836 F.2d 330 (7th Cir. 1988).

**B.**

## The Plaintiff Breached the March Agreement By Failing to Make
## Any Allocation of the Settlement Amount to Her Children and By Misleading
## The Surrogate's Court About the Existence and Nature of Her Childrens' Claims

Unwilling to accept a release that in their view might be subject to attack on the ground that it lacked consideration, the defendants, from the beginning, insisted that there be some allocation of the $40,000 to the children. Ms. Seymour had "accept[ed]" this provision through Ms. Matlaw's March 14th email. Of course, the Surrogate's Court was free not to approve the release and settlement if it concluded that the allocation was not in the childrens' "best interests." If that occurred, there would be no settlement, but the plaintiff would have performed under the agreement. Ms. Seymour was not, however, free to eliminate her obligation to make an allocation or at least to allow the Surrogate's Court to do so.

To ensure that there would be no allocation to her children, Ms. Seymour's petitions to the Surrogate's Court were drafted in such a way that they neither adequately nor accurately informed Judge Seibert of the Surrogate's Court of the information statutorily required be included in the petitions. Without that information, he could not make an informed judgment about whether the settlement agreement was in the childrens' "best interest," as required by §§ 1207-1208 of New York's Civil Practice Law and Rules. In order to make that discretionary judgment, *id.*, Judge Seibert manifestly, had to be "fully advised" of the relevant facts. *See Edionwe v. Hussain*, 777 N.Y.S.2d 520, 522 (N.Y.A.D. 2nd Dept. 2004). Not only did the petitions not "fully advise" the Court, they badly misled him.

Section 1208(a) provides the procedures that *must* be followed and the information that *must* be provided by affidavit when petitioning the Surrogate's Court for approval of a settlement affecting a minor or incompetent:

25

1. name, residence and relationship to the infant;

2. name, age and residence of the infant;

3. the circumstances giving rise to the action or claim [of the infant];

4. the nature and extent of the damages sustained by the infant;

5. the terms and proposed distribution of the settlement and his approval of both;

6. the facts surrounding any other motion or petition for settlement of the same claim, of an action to recover on the same claim or of the same action;

7. whether reimbursement for medical or other expenses has been received from any source; and

8. whether the infant's representative or any member of the infant's family has made a claim for damages alleged to have been suffered as a result of the same occurrence giving rise to the infant's claim and, if so, the amount paid or to be paid in settlement of such claim or if such claim has not been settled the reasons therefor.[12]

Without such information, the Court could not fulfill its duty of "scrutinizing" the proposed settlement "to assure that it was fair and reasonable and in the infant plaintiff's best interests." *Edionwe*, 777 N.Y.S.2d at 522. Unless the requirements of §§ 1207 and 1208 are complied with, the approval is subject to collateral attack. *Ferraro v. Stripekis*, 401 N.Y.S.2d 252 (N.Y.A.D. 2nd Dept.1978); *Caglioti v. Medi-Cab, Inc.*, 382 N.Y.S.2d 311 (N.Y.A.D. 1st Dept. 1976); *Valdimer v. Mount Vernon Hebrew Camps, Inc.*,195 N.Y.S.2d 24, *aff'd*, 210 N.Y.S.2d 520 (N.Y.1961).[13] A settlement approval might also

---

[12] The plaintiff's lawyers were aware of §1208 through Mr. Howard's March 14, 2005 email. (*Def.Br.*, Exs. D5, D6). Mr. Howard went so far as to provide a draft affidavit, which accurately portrayed plaintiff's Fair Housing Act claim as it related to her children and made specific reference to an allocation to the children. (*Id.* at ¶¶4-5).

[13] The plaintiff's attempt to distinguish these cases on the basis that the minor was a named plaintiff in the underlying litigation ignores the unambiguous text of § 1207 which makes clear that the

(continued...)

be set aside on substantive grounds such as fraud, duress or mistake. *Fletcher v. Hatch*, 602 N.Y.S.2d 718, 719-20 (N.Y.A.D. 3rd Dept. 1993).[14]

Ms. Seymour's petitions did not fully advise the court of the nature of the minors' claims, the circumstances giving rise to those claims, and the nature and extent of the damages purportedly sustained by them. All they did was to explain *Ms. Seymour's claims*, thereby defeating the whole purpose of the exercise. Thus, Ms. Seymour's petitions stated:

> By her complaint, that alleged discrimination, Petitioner sought damages. The damages sought included the loss of commissions, business, and business opportunity because of discrimination against her. The amount . . . lost that she sought to recover exceeded $90,000.00. Petitioner has decided to settle her claim for a lower amount, $40,000, to avoid the cost, delay, uncertainty, and burden of further litigation in Illinois.

(*Defendants' Br.* Exs. F1-F2, at ¶4). It misses the mark to say that this statement was literally true, for "'a statement which is technically true as far as it goes may nevertheless be fraudulent, where it is misleading because it does not state matters which materially qualify the statement as made. In other words, a half-truth is sometimes more misleading than an outright lie.'" *St. Joseph Hospital v. Corbetta Construction Co.*, 21 Ill.App.3d 925, 953, 316 N.E.2d 51 (1st Dist. 1974). *See also People v. Curry*, 11 A.D.3d 150, 782 N.Y.S.2d 66 (N.Y.A.D. 1st Dept. 2004) ("relating only part of the truth can accomplish a deception

---

[13](...continued)
requirements of §1207 have nothing to do with whether there is even a pending action, let alone whether the minor is named in it. By its plain terms, §1207 is applicable even where "no action has been commenced."

[14] Ms. Seymour's children would be in a position to blame their mother's lawyers for the underinclusive presentation to the Surrogate's Court. Being innocent of any wrongdoing, they would contend that their interests must be protected and the releases set aside.

as effectively as presenting a complete fabrication.").[15]

The second amended complaint alleged no fewer than three times that the defendants discriminated "against [Ms. Seymour] *and her children.*" And there appears no fewer than six times the allegation that both she "*and her family*"are entitled to damages. (*2nd Amended Complaint*, ¶ 111; Prayer for Relief (d); ¶ 114; Prayer for Relief (d); ¶ 116; Prayer for Relief (d); ¶ 118). Yet, Ms. Seymour's petitions make no mention of any of these allegations. The "misleading omissions" continue in paragraph 7 of the petitions, which state: "there is no mention of" Devin Madkin or Peter Madkin in the "federal complaint." (*Defendants' Br.* Exs. F1-F2, at ¶ 7). Although the federal complaint refers to "her children" or her "family" at least seven times, the plaintiff's lawyers argue that paragraph 7 is not misleading because the second amended complaint does not mention the children "by name." (*Plaintiff's Response to Defendants' Joint Brief in Support of Their Cross-Motion*, at 3-4).

On its face, this argument is preposterous. The only thing about it that "we can commend is the hardihood in supposing [it] could possibly succeed." *United States v. Minneci*, 142 F.2d 428, 429 (2nd Cir. 1944)(L. Hand, J.). More than a century ago, Justice Holmes cautioned that "[w]e must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443,

---

[15] *Cf. Emery v. American General Finance, Inc.* 71 F.3d 1343, 1348 (7th Cir. 1995) (Posner, J.)("But it is not true that if you are not a fiduciary anything goes, short of false statements. A half truth, or what is usually the same thing a misleading omission, is actionable as fraud".); *Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 295 Ill.App. 3d 567 692 N.E.2d 812, 817 (1st Dist. 1998); *Hyder v. Leewords Creative Crafts,* Inc., 245 Ill.App.3d 258, 613 N.E. 2d 805, 811 (2nd Dist. 1993).

460 (1889). The inescapable reality is that although Ms. Seymour's children were mentioned repeatedly in the pleadings, Judge Seibert was misled into believing that they were strangers to the complaint and thus to the discrimination itself. In short, Ms. Seymour's presentation to the Surrogate's Court did not comply with New York law and constitutes a breach of the settlement agreement.[16]

## C.
## The Plaintiff Breached the Terms of the April 28 Version of the Settlement Agreement

The plaintiff contends that there was no settlement agreement until after she assented to Mr. Howard's April 28th version by making application on May 20th to the Surrogate's Court. Even if one were to assume that the April 28th version *is* the settlement agreement, Ms. Seymour breached it.

Following Ms. Seymour's March 30th rejection of the allocation provision in the exchange of emails, the plaintiff's lawyers eliminated language in Paragraph c. of the settlement agreement and release relating to the childrens' claims, and then assured the defendants' counsel that the changes were minor and non-substantive. Whether one applies basic principles of estoppel or the fundamental contract principle that a contract is to be construed strictly against the drafter, *Liautaud v. Liataud*, 221 F.3d 981, 986 (7th Cir. 2000), the result is the same: the parties had agreed that there would be an allocation of some amount in order to satisfy the defendants' analysis of New York law that specific consideration was required to support the release of the minors' claims. Ms. Seymour breached this provision of the settlement agreement by refusing to make an allocation. Thus, the defendants are now subject to the threat of future

---

[16] While there was no express mention of compliance with New York law, that compliance was obviously an implied and indispensable term of the agreement. *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 329 (1927); *Jenson v. Quik International*, 345 Ill.App.3d 713, 715, 801 N.E.2d 1124, 1126 (1st Dist. 2003); 11 Williston, Contracts §31.7 at 321 (4th Ed. 1999) (footnotes omitted).

litigation in which they would have to litigate the validity of the release – the very evil they sought to avoid.[17]

In addition to this change, the plaintiff's lawyers made another, which they did not disclose. They changed the phrase in Paragraph c., "the claims of the minor children," to "any claims of the minor children." Reference to "*the* claims of the minor children" connotes the existence of an extant controversy, not some abstract, theoretical claim which is connoted by the phrase, "*any* claims of the minor children." All this was part of the plaintiff's overarching attempt to obtain an approval of the settlement agreement without allocating any part of the $40,000 to Ms. Seymour's children. Central to that end was failing to inform Judge Seibert about the circumstances surrounding the childrens' claims and the damages she claimed they suffered, as explicitly required by New York law. CPLR § 1208.

According to the petitions, the plaintiff "decided to settle *her* claim for . . . $40,000." (*Defendants' Br.* Exs. F1-F2, at ¶ 4). Further on in the document, the plaintiff requested that the court "approve *the* Settlement Agreement, . . . and specifically find that [Devin and Peter] Madkin ha[ve] no interest in such settlement . . . ." (*Defendants' Br.* Exs. F1-F2, at ¶ 11). This is not what the April 28th version obligated her to do. Even under the plaintiff's version of the pertinent language, plaintiff was to "obtain[] approval of the proposed settlement of *any claims of the minor children named Peter Madkin and Devin Madkin* from a court in New York" – not the approval of her settlement and a declaration that the children have no interest in it. (*Defendants'* Ex. E2). Given the deceptive manner in which plaintiff dealt with the New York court, no court would have hesitated to declare that the children had no real claims and thus no interest in the $40,000 settlement. In short, the approval of the plaintiff's own $40,000

---

[17] Indeed, part of the present motion deals with quarrels over the need for separate consideration. Thus, the defendants are already confronted with an issue they should not have had to face.

settlement is simply not the same thing as the approval of the settlement of her children's claims, which the court was misled into believing were non-existent.

For the reasons discussed earlier, Ms. Seymour's petitions fell far short of "fully advising" Judge Seibert of the nature of the Fair Housing Act claim, the nature of the children's claims and damages. Consequently, they were noncompliant with New York law, and Ms. Seymour has thus breached her contractual duties even as measured by the April 28th version.

Whether a "fully informed decision maker" might have approved the settlement and the release of the minors' claims without any allocation, *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 544 (1985), is impossible to know. It is certainly possible that had the argument been made by Ms. Seymour to Judge Seibert that she made to her lawyers in her March 30th email regarding the unfairness of any payment to her children, he would have concluded that it was still in the minors' best interests to approve a release of whatever claims they had. [18] But Ms. Seymour and her lawyers obviously did not have faith in that position or in how Judge Seibert would react. [19]

## D.
## The Defendants Are Entitled to the Settlement Agreement They Bargained For

---

[18] Perhaps payment to Ms. Seymour could also be consideration for the release of the childrens' claims. *See* Restatement (Second) of Contracts, §71(4) (1981); *General Electric Capital Corp. v. Domino's Pizza, Inc.*, No. 93 C 5070, 1994 WL 256776, *5 (S.D.N.Y. June 2, 1994). But that was not the bargained for consideration, and that theory was never presented to Judge Seibert.

[19] Neither side has referred to the parol evidence rule -- "the rule that if a written contract is "integrated," parol (i.e., extrinsic) evidence, whether oral or written, concerning the negotiations or other background to the contract, including preliminary agreements and understandings, is inadmissible to contradict the apparent meaning of the written contract." *Utica Mut. Ins. Co. v. Vigo Coal Co., Inc.*, 393 F.3d 707, 713-714 (7th Cir. 2004)(Posner, J.). Here, the emails do not vary or contradict the April 28th version. In any event, the parties, by submitting the emails in support of their respective arguments, have waived its application. *Feldman v. Oman Associates, Inc.*, 20 Ill.App.3d 436, 439, 314 N.E.2d 338, 341 (1st Dist. 1974).

Saving the least for last, the plaintiff raises three additional points: the settlement of the children's claims was an insignificant matter; regardless of any impropriety in New York, the defendants are nevertheless adequately protected from any claims by Ms. Seymour's children by the statute of limitations; and finally, the release is valid because, under New York law, it need not be supported by the consideration that would have been provided had Ms. Seymour made the (contractually required) allocation.

To say that the issue of the children's claims was a "footnote" to the parties' settlement agreement, was "never part of . . . the Defendants' mental processes," and that the "Defendant's[sic] utter lack of interest . . . [in the topic] was manifest" does not merely strain credulity, it offends it. (*Amended Brief in Support of Plaintiff's Motion to Enforce Settlement*, at 7; *Brief in Support of Plaintiff's Motion to Enforce Settlement*, at 7, 11). Even a cursory reading of the emails makes luminously clear the importance defendants attached to the release of the childrens' claims. As late as May 23, 2005, Mr. Caruso made reference to the defendants' "requirement of protection from any action by a child when they reach maturity." (*Defendants' Br.,* Ex. D24).

Equally feckless is the argument that the defendants are adequately protected because the statute of limitations has run. Predictably, the argument is supported only by the *ipse dixit* of Ms. Seymour's lawyers. Hence, the argument is waived. *Perry v. Sullivan,* 207 F.3d 379, 383 (7th Cir. 2000); *United States v. Cusimano,* 148 F.3d 824, 828 n.2 (7th Cir. 1998). More importantly, the defendants bargained for certainty, not for Ms. Seymour's lawyer's prognostications or the opportunity to litigate what is at least now an open question, and a court's role "is not to redistribute...risks and opportunities as [it sees] fit...." 11 Williston, Contracts §31.5 at 298 (4th Ed. 1999).

The Fair Housing Act requires that an aggrieved person file a complaint with the Department of Housing and Urban Development within one year and commence an action in federal court no later than two years after the last occurrence of alleged discriminatory conduct. 42 U.S.C. § 3610(a)(1)(A)(i); 42 U.S.C. § 3613(a)(1)(A). Time requirements in lawsuits between private litigants are customarily subject to equitable tolling. Indeed, the Supreme Court has made clear that the statutory time limits applicable to lawsuits against private employers under Title VII are subject to equitable tolling. *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 95 (1990). Whether that can include infancy, the Supreme Court has not yet said. While there are isolated decisions, they are meaningless until the Supreme Court has spoken. Even decades of uniform circuit precedent on a given issue does not ensure that the Supreme Court will agree when it finally hears the issue. *See, e.g., McNally v. United States*, 483 U.S. 350 (1987).

Finally, there is the argument that the defendants are protected from future litigation since under New York law the release of the minors' claims need not be supported by consideration. A number of objections to this contention come readily to mind. First, the cases cited by the plaintiff did not discuss the issue of consideration to support a settlement,[20] and New York courts generally find the adequacy of consideration to support a settlement to be a material issue. *See, e.g., F & K Supply Inc. v. Willowbrook Development Co.*, 732 N.Y.S.2d 734, 737 (N.Y.A.D. 3rd Dept. 2001); *Della Rocco v. City of Schenectady*, 717 N.Y.S.2d 704, 706 n.2 (N.Y.A.D. 3rd Dept. 2000).

Second, no decision in this case can bind Ms. Seymour's children as they are not parties. Thus,

---

[20] *Tudorov v. Collazo*, 627 N.Y.S.2d 419 (N.Y.A.D. 2nd Dept. 1995) held that a guardian *ad litem* was not authorized to apply for approval of a settlement of a party's claim, while *Candiloro v. City of New York*, 272 N.Y.S.2d 679 (N.Y.A.D. 2nd Dept. 1966) simply stated that the entry of a judgment on consent, in the absence of an order of compromise and without the protective procedures prescribed by the CPLR for the settlement of infant's actions complied with by the parties, was in error.

even if I were to agree with the plaintiff's "no consideration needed" argument, the children would be free to litigate any claims they might have against the defendants. Third, and most importantly, the no consideration needed argument puts out of view what occurred before Judge Seibert and the plaintiff's non-compliance with New York law discussed earlier. Whether Judge Seibert would or could have approved the releases without some allocation had he been "fully advised in the premises" is anyone's guess. Obviously, the plaintiff and her lawyers did not think so, or they would not have concealed Ms. Seymour's March 30th email, would not have changed the word "the" to "any," would not have deleted the phrase in Paragraph c. that they did, would not have falsely characterized it as a minor non-substantive change, and would not have made the misleading and underinclusive presentation to Judge Seibert that they did. Thus, to argue that under New York law a release need not be supported by consideration, is to argue an analytical irrelevancy.

The purpose of any settlement agreement is to eliminate the uncertainties inherent in litigation. *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994); *Carson v. American Brands, Inc.*, 450 U.S. 79, 87 (1981). To that end, the defendants insisted on a valid release of the childrens' claims by the Surrogate's Court. The defendants did not bargain for an empty form – for a release, regardless of how it was obtained. Plaintiff cannot substitute for the promised valid releases her lawyer's partisan prophesies of how a court would rule in the event the defendants were to become embroiled in litigation with the children on the question of the statute of limitations or the enforceability of the releases she obtained under the most questionable of circumstances. [21]

---

[21] The question is not, as the plaintiff has posed it, whether the defendants might win if a suit is
(continued...)

34

## E.
## Defendants are Entitled to Specific Performance of the Settlement Agreement

Settlement agreements may be enforced by specific performance. *Kokkonen*, 511 U.S. at 378; *Industrial Associates, Inc. v. Goff Corp.*, 787 F.2d 268, 269 (7th Cir. 1986); *Blue Cross and Blue Shield Assn. v. American Express*, 2005 U.S. Dist. LEXIS 15158 (July 25, 2005, N.D.Ill.); *Cummings v. Beaton & Associates, Inc.*, 249 Ill.App.3d 287, 324, 618 N.E.2d 292, 314(1st Dist. 1992). Specific performance is an equitable remedy, which rests within the sound discretion of the trial court based on all facts and circumstances. *Daniels v. Anderson*, 162 Ill. 2d 47, 56, 642 N.E.2d 128 (1994); *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 227 (7th Cir. 1993). Specific performance refers to the performance of the very thing the contract calls for. *Rothner v. Mermelstein*, 219 Ill.App.3d 502, 507, 579 N.E.2d1022,1026 (1st Dist. 1999).

Specific performance is available where: (1) there is a valid, binding, and enforceable contract; (2) the party seeking specific performance has complied with the terms of the contract or is ready, willing, and able to; and (3) the opposing party failed or refused to perform his part of the contract, and there is an inadequate remedy at law. *Blue Cross and Blue Shield Assn., supra.* [22] Relief can be denied where the change of circumstances would result in a peculiar hardship or would produce an inequitable result. *Gordon v. Bauer*, 177 Ill.App.3d 1073, 1083, 532 N.E.2d 855, 861 (5th Dist. 1988). In the instant case,

---

[21](...continued)
brought by the children at some indeterminate time in the future. The defendants bargained for a valid release of whatever claims the Seymour children had in order to ensure that there would be no further litigation "when they reach maturity." (*Defendants Br.*, Ex. D24). They did not bargain for the chance to win the case.

[22] Damages need not be wholly inadequate for an injury to be irreparable. *Roland Machinery Co. v. Dresser*, 749 F.2d 386 (7th Cir. 1984).

all the prerequisites for specific performance exist.

Thus, Ms. Seymour is hereby ordered not later than December 9, 2005 to: (1) make an appropriate re-application to Judge Seibert in the Surrogate's Court in New York; (2) submit petitions that set forth accurately the allegations that were made in the complaint and the amended complaints regarding her children and the facts and circumstances of her Fair Housing Act claim as set forth in those pleadings and in her deposition; 3) make a reasonable allocation of a sum of money from the $40,000 payment to be applied to her children's claims; and 4) comply in all respects with applicable New York law in making application to Judge Seibert. Under New York law, it shall be up to him to determine whether the amount of the allocation selected by Ms. Seymour is adequate.

Ordering Ms. Seymour to provide defendants with file stamped copies of all materials to be filed with the New York Court and provide them with seven days notice of hearings in the New York Court is improper as a matter of specific performance since these were not terms of the parties' settlement agreement. However, that does not mean that a court does not have authority to require Ms. Seymour to comply with these requirements, not as a matter of specific performance, but to ensure that there can be appropriate monitoring of her performance. Thus, Ms. Seymour shall comply with these latter two requirements.

### III.
### THE DEFENDANTS' REQUEST FOR ATTORNEYS' FEES

The defendants have requested an award of attorneys' fees. However, they have cited no case to support the request; they have neither identified those against whom they are seeking fees, nor the basis on which a fee award should be bottomed. Is the request for fees against the plaintiff's lawyers, the

plaintiff, or both. If it is against the lawyers, are all equally culpable and are all to bear equally the burden of any award? These and other questions must be answered before an appropriate fee award can be entered. It is not for a court to make the arguments for a party and to provide the legal analysis. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

The defendants shall have until November 15, 2005 to file a supplemental memorandum not to exceed ten pages in support of their request for attorneys' fees. The plaintiff shall have until November 22, 2005 to respond. Her response may not exceed ten pages Unless the court orders otherwise, there shall be no reply by the defendants.

## CONCLUSION

For the foregoing reasons, the defendants' motion to enforce settlement and for attorneys fees [#43] is GRANTED in part and DENIED in part without prejudice, and the plaintiff's motion to enforce settlement [#41] is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** November 8, 2005

37